IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DEFLECTO, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 13-0116-CV-W-ODS |
| | ) |
| DUNDAS* JAFINE INC., | ) |
| | ) |
| Defendant. | ) |

CLAIM CONSTRUCTION ORDER

Plaintiff Deflecto, LLC ("Deflecto") brought this patent infringement action against Defendant Dundas* Jafine Inc. ("Dundas Jafine"), alleging that Dundas Jafine infringed two of its patents: (1) the "Exhaust Vent with External Guard," Patent No. 5,722,181 (the "'181 Patent"); and (2) the "Hooded Exhaust Vent," Patent No. 5,916,023 (the "'023 Patent"). The parties submitted claim construction briefs in which several terms are in dispute. On April 3, 2014, the Court held a claim construction hearing.

I. STANDARD

A patent infringement analysis requires two steps: (1) proper construction of the asserted claim; and (2) a determination of whether the particular accused device infringes under the claim construction. *Nazomi Communications, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1343, 1245 (Fed. Cir. 2014). This Order addresses the first step—claim construction. Claim construction is the court's determination of the scope and meaning of the patent claims asserted. *See Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998).

Generally, a claim's words are given their ordinary and customary meaning—that is, "the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Mico Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). In some

instances, the ordinary meaning of claim language is "readily apparent" and claim construction merely requires applying "the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). In those situations, a dictionary can be helpful for claim construction. *Id.* However, in other cases, determining the ordinary and customary meaning of claim language requires the court to look at three sources: (1) the claims; (2) the specification; and (3) the prosecution history. *Id.*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

The claims themselves provide "substantial guidance" to the meaning of claim terms. *Phillips*, 415 F.3d at 1314. The context of the surrounding words of a claim should also be considered. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003). The claims themselves are part of a "fully integrated written instrument" that consists of a specification and concludes with the claims. *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978). "Thus, the specification is always highly relevant to the claim construction analysis. "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

"Where the intrinsic record is ambiguous, and when necessary, [a district court may] rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting *Phillips*, 415 F.3d at 1312). However, extrinsic evidence less is reliable than the patent and its prosecution history in determining the meaning of claim terms. *Phillips*, 415 F.3d at 1318. Nevertheless, extrinsic evidence may be considered, but only to assist the court in understanding the patent; it cannot be used to vary or contradict the claim terms. *Markman,* 52 F.3d at 981. Having set forth the relevant claim construction standards, the Court will now construe the disputed claim terms.

## II. DISCUSSION

The parties seek interpretation of five disputed terms for the '181 patent and six disputed terms for the '023 patent.

### A. '181 Patent Terms

**"Converging/Converge"**

The term "converging" is used in claims 1, 11, and 16 of the '181 patent in the phrase, "upper hood portion including a top wall, a pair of oppositely-disposed sidewalls, and a front wall, said top wall and the pair of side walls converging in the direction of said front wall." '181 Patent, Col. 7, ll. 36-39 and Col. 8, ll. 34-37, 58-61. "Converge" is used in claim 2 of the '181 patent in the phrase, "the bottom wall and the pair of oppositely-disposed sidewalls of said lower cage portion converge in the direction of said front wall." '181 Patent, Col. 7, ll. 51-53.

Deflecto proposes the following construction: "come together (at some point) in the direction of the front wall." Dundas Jafine contends that "converge" is defined explicitly in the patent specification to mean "taper inwardly." Dundas Jafine points to the specification that states, "the two sidewalls 33 and 34 taper inwardly (converge) as they extend from band 30 to front wall 35." '181 Patent, Col. 3, ll. 64-66.

In some instances, the patent specification may give a claim term a special definition that differs from the meaning it would otherwise possess; in those instances, the inventor's lexicography controls. *Phillips*, 415 F.3d at 1316. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner v. Sony Computer Entertainment America LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012). There must be a clearly expressed intent to redefine a term. *Id.* For example, using words like "means" and "defined" provides clear lexicography. *E.g.*, *3M Innovative Properties Co. v. Avery Dennison Corp.,* 350 F.3d 1365 (Fed. Cir. 2003) (a patentee acted as its own lexicographer when the specification stated: "'Multiple embossed' *means* two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing.") (emphasis added); *Astrazeneca AB v. Mutual Pharm.*,

3

384 F.3d 1333, 1339 (Fed. Cir. 2004) ("Certainly the '081 specification's statement that '[t]he solubilizers suitable according to the invention are *defined below*' provides a strong signal of lexicography.") (emphasis added).

Here, the Court concludes that the patentee did not make a clear express intent to redefine "converge" to mean "taper inwardly." The patentee did not use words such as: *converge means taper inwardly* or *converge is defined as taper inwardly*. Instead, the patentee merely placed the word "converge" inside a parenthetical. This does not show an express intent to redefine the word. Further, the parenthetical was not used until the second time the word "converge" was mentioned in the specification; the invention summary used the word "converge" without also using the words "taper inwardly." '181 Patent, Col. 2, ll. 18-21. If the patentee intended to redefine "converge," it is likely the patentee would have used the parenthetical the first time the word was used.

The Court concludes that the ordinary meaning of "converge" and "converging" is readily apparent and claim construction merely requires the use of a dictionary and the application of "the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Accordingly, the Court construes "converge" to mean "come together" and "converging" to mean "coming together." *See* Merriam-Webster's Collegiate Dictionary, 10th Ed. (1996) (Doc. # 84-1) ("to come together and unite in a common interest or focus"); *see also* '181 Patent, Col 2., ll. 18-21 and Col. 3, ll. 58-Col. 4, l. 52.

**"Solid Nature"**

The term "solid nature" is used in claim 1 of the '181 patent in the phase, "an upper hood portion including a top wall, a pair of oppositely-disposed sidewalls, and a front wall, said top wall and the pair of side walls converging in the direction of said front wall, each of said hood portion walls being of a solid nature in order to provide a suitable barrier to moisture and debris . . . ." '181 Patent, at Col. 7, ll. 37-42.

Deflecto proposes that "solid nature" be construed as "suitably creates a barrier against moisture and debris." Deflecto's proposed definition is not helpful as it would result in a repetition if it was substituted for the words "solid nature" in claim 1. Dundas

Jafine proposes the following construction: "an object's form having no gaps or spaces so that neither moisture nor debris can pass through it." The Court also rejects Dundas Jafine's proposed definition for the reasons that will be discussed below.

The Court looks to the context of the surrounding words to determine the ordinary meaning of "solid nature." *See ACTV, Inc.*, 346 F.3d at 1088. Claim 1 provides that the upper hood is of a "solid nature in order to provide a suitable barrier to moisture and debris." '181 Patent, Col. 7, ll. 36-42. The claim language uses the word "nature" to modify "solid." *Id.* In doing so, the patentee indicated there was no requirement that walls be completely solid. The claim also requires that the walls be "suitable" as a barrier, which does not indicate that the walls that are of a "solid nature" serve as an absolute barrier to the elements. *Id.*

The patent specification also uses similar language. It states, "the solid nature of the various walls of the hood provide a suitable barrier against rain and snow and other debris which might fall onto [the] guard." '181 Patent, Col. 4, ll. 41-44. Again, the walls, which are of a "solid nature," are to provide a "suitable barrier."

Finally, the Court is guided by the prosecution history. The patentee amended claim 1 by removing the limitation "said upper hood portion providing a weather barrier" and added the phrase, "said hood portion walls being of a solid nature in order to provide a suitable barrier to moisture and debris." '181 Prosecution History Response to February 21, 1997 OA (Doc # 81-6), page 3. Again, the term "solid" is modified by "nature" and the walls are to provide a "suitable barrier."

The Court rejects Dundas Jafine's proposed approach—that neither moisture nor debris can pass through—because the use of the terms "nature" and "suitable" would not mandate such a narrow interpretation. The claim language, specification, and prosecution history all recognize that the walls are of a "solid nature" that provide a "suitable barrier" to the elements. There is no indication that the walls provide an absolute bar to moisture and debris. Accordingly, the Court construes "solid nature" to mean "essentially solid."

**"Weather barrier"**

The term "weather barrier" is used in claim 10 of the '181 patent in the following phrase:

> a snap-on exhaust vent guard which is received by said vent frame, said exhaust vent guard including an upper hood portion constructed and arranged to provide a weather barrier and a lower cage portion constructed and arranged to permit the free flow of air through said lower cage portion and to prevent the nesting of birds inside of said exhaust vent guard.

'181 Patent, at Col. 8, ll. 27-33.

Deflecto proposes that the term be construed as "an upper hood which provides a barrier against the elements, e.g., rain or snow." Dundas Jafine proposes that the term be construed as "an object made in a fashion such that natural elements, such as wind, rain, sleet, and snow, cannot pass through it." Dundas Jafine seeks to introduce new language into the plain language of the claim. The patentee did not draft the claim in a way that described the weather barrier as a "complete" or "absolute" barrier.

The specification provides that "the upper hood portion is designed so as to provide a weather barrier." '181 Patent, Col 2, ll. 18-21. The specification also states, "[t]he solid nature of the various walls of hood 22 provide a suitable barrier against rain and snow and other debris which might fall onto guard 20. . . . Hood 22 provides the requisite weather barrier . . . ." '181 Patent, Col 4, ll. 41-52. Again, the patentee uses the word "suitable" to describe the barrier that protects against rain and snow. Thus, there is no requirement that the walls are an absolute or complete barrier, or—as Dundas Jafine proposes—an object in which the elements cannot pass through.

Consistent with its ordinary and customary meaning, the Court defines "weather barrier" as meaning "an object that provides protection against the natural elements, e.g., rain and snow."

**"Snap-on"**

"Snap-on" appears in claim 10 of the '181 patent in the following phrase:

> a snap-on exhaust vent guard which is received by said vent frame, said exhaust vent guard including an upper hood portion constructed and arrange to provide a weather barrier and a lower cage portion constructed

6

and arranged to permit the free flow of air through said lower cage portion
and to prevent the nesting of birds inside of said exhaust vent guard.

'181 Patent, at Col. 8, ll. 27-33.

Deflecto proposes that "snap-on" means "an attachment system that avoids the use of any extraneous mounting hardware." The Court finds this proposal too broad and not a definition at all as it does not provide any meaning to the words. As Dundas Jafine argues, and the Court agrees, any mechanism—whether it snaps or not—would encompass Deflecto's construction as long as it did not use extraneous mounting hardware. Dundas Jafine proposes the following construction: "attaching an object to another object that will then function as part of the whole by way of a snap-fit." Dundas Jafine unnecessarily points to extrinsic evidence to support its definition. After reviewing the language in the claim and specification, the Court concludes that "snap-on" does not need to be construed and shall be given its plain and ordinary meaning.

**"Snap-receipt"**

"Snap-receipt" appears in claim 14 and claim 15 of the '181 patent. Claim 14 reads: "The exhaust vent of claim 10 wherein said vent frame includes a peripheral wall and a plurality of snap-receipt tabs disposed in said peripheral wall." '181 patent, Col. 8. ll. 48-50. Claim 15 reads:

> The exhaust vent of claim 14 wherein said lower cage portion
> includes a back edge and a plurality of snap-receipt openings, said back
> edge and said plurality of snap-receipt openings being separated by a grid
> wall portion, said grid wall portion providing an abutment surface against
> said snap-receipt tabs with one each of said tabs being positioned in a
> corresponding one of said snap-receipt openings.

'181 Patent, at Col. 8, ll. 51-57.

Deflecto's proposes the followings construction for "snap-receipt"—"enabling attachment without the use of any extraneous hardware." Deflecto's proposal is too broad and would encompass other attachment mechanisms that the patentee did not intend. Additionally, Deflecto's proposed definition does not give meaning to the word "snap-receipt." Dundas Jafine proposes that "snap-receipt" be construed as "a portion of a snap-fit assembly."

7

The term "snap-receipt" is related closely to the term "snap-on." The Court concludes that "snap-receipt" needs no construction and shall be given its plain and ordinary meaning.

B. '023 Patent Terms

**"Snap-fit assembly"**

"Snap-fit assembly" appears in claim 1 of the '023 Patent in the phrase, "a unitary guard for covering over said opening, said guard including a plurality of projections for the snap-fit assembly of said guard to said vent hood."

Deflecto proposes that the term be construed as "a fit that enables the guard to be removable, and also readily assembled." Deflecto's proposed construction does not give any meaning to the terms used in the claim. Thus, the Court rejects Deflecto's proposed construction.

Dundas Jafine proposes that the term be construed as "an assembly for joining together two parts having a portion that deflects for engagement with the mating piece and abruptly returns to its original position to latch the two parts together." Dundas Jafine points to extrinsic evidence, which the Court does not find necessary, as the term "snap-fit" has a meaning that is understood by considering the intrinsic evidence.

The Court construes "snap-fit assembly" to mean "the process of joining two parts by way of a snap." This is supported by the specification that discusses a "snap-fit assembly" in which the guard snaps to the hood. '023 Patent, Col. 3, ll. 48-49, 61-62.

**"Snap-in tab"**

"Snap-in tab" appears in claim 14 and claim 18 of the '023 Patent. Claim 14 reads: "the vent guard of claim 13 wherein each of said plurality of attachment projections is a snap-in tab." '023 Patent, Col. 11, ll. 1-3. Claim 18 reads: "the basket guard of claim 17 wherein each of said plurality of attachment projections is a snap-in tab." '023 Patent, Col. 12, ll. 8-9.

Dundas Jafine wishes to construe the term as "a portion that is capable of resiliently deflecting and returning to its non-deflected state." The Court rejects this

8

proposed construction as Dundas Jafine relies on extrinsic evidence for support, which the Court finds unnecessary.

Deflecto's proposed construction is "a device that sticks out from the guard outer edge to enable attachment of the guard to the hood." Although Deflecto cites to intrinsic evidence, namely the specification, in which "snap-in tabs" are described as tabs extending outward from the guard to enable attachment to the hood ('023 Patent, Col. 4, ll. 62-67; Col. 5, ll. 63-66), the Court finds that construction of "snap-in tab" is not necessary and the term shall be given it plain and ordinary meaning.

**"Snap"**

"Snap" appears in claims 2 and 10 of the '023 Patent in the phrase "said plurality of projections is a tab which is constructed an arranged to snap into a corresponding one of said receiving apertures." '023 Patent, Col. 10, ll. 13-15, 46-48. "Snap" also appears in claim 6 in the phrase "said plurality of projections is a spring clip which is constructed and arranged to snap onto said vent hood." '023 Patent, Col. 10, ll. 27-29.

Dundas Jafine cites to extrinsic evidence and proposes the following construction: "requires a portion that deflects and then returns to the original position." Deflecto contends that "snap" should be given its plain and ordinary meaning. After reading the claim language, the Court agrees and concludes that "snap" needs no construction and shall be given its plain and ordinary meaning.

**"Spring clip(s)"**

The term "spring clip" or "spring clips" appear in claim 6, 8, and 15 of the '023 Patent. Claim 6 includes the phrase, "said plurality of projections is a spring clip which is constructed and arranged to snap onto said vent hood." '023 Patent, Col. 10, ll. 27-29. Claim 8 reads, "a total of two spring clips, one being integral with one side edge and the other being integral with the opposite side edge of said guard." '023 Patent, Col. 10, ll. 35-38. Claim 15 includes the phrase, "said plurality of attachment projections is a spring clip." '023 Patent, Col. 11, ll. 3-4.

Deflecto contends that "spring clip(s)" shall be given its plain and ordinary meaning. Dundas Jafine proposes that the term be construed as "a clip or clips which

can be expanded to an open position to allow for the insertion of an object and when the clip is released it grasps around or clamps the inserted item so as to secure it." Dundas Jafine unnecessarily points to extrinsic evidence for support and uses words that are not found in the claim specification. The Court concludes that "spring clip(s)" shall be given its ordinary meaning and needs no construction.

**"Slide-on clip"**

"Slide-on clip" appears in claim 16 of the '023 Patent in the phrase, "said plurality of attachment projections is a slide-on clip." '023 Patent, Col. 11, ll. 5-6.

Dundas Jafine's proposed construction is: "a clip that uses a smooth movement to go across an inserted object's surface to tightly clamp the object to as to secure it." The Court finds that Dundas Jafine's proposed construction improperly narrows the scope of the claims. Dundas Jafine does not point to anywhere in the claim specification that would support its construction. The specification describes an embodiment of slide-on clips as "unitary guard [that] simply slide onto the ledge such that interlocking edges fit against the top surface of a ledge." '023 Patent, Col. 6, ll. 49-53. This does not describe the clips as using a "smooth movement" or "tightly clamping." The Court declines Dundas Jafine's invitation to add extraneous limitations to the claims. *See Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added 'wholly apart from any need to interpret what the patentee means by particular words or phrases in the claim.") (internal citations omitted). The Court concludes finds that "slide-on clip" needs no construction and shall be given its plain and ordinary meaning.

**"Projections"**

"Projections" appear in claims 1, 2, 6, 10, and 13-18 of the '023 Patent. The term appears in the following claims:

> Claim 1: "a plurality of projections for the snap-fit assembly of said guard to said vent hood." '023 Patent, Col. 10, ll. 9-10.

Claim 2: "said plurality of projections is a tab which is constructed and arranged to snap into a corresponding one of said receiving apertures." '023 Patent, Col. 10, ll. 13-15.

Claim 6: "said plurality of projections is a spring-clip which is constructed and arranged to snap onto said vent hood." '023 Patent, Col. 10, ll. 27-29

Claim 10: "said plurality of projections is a tab which is constructed and arranged to snap into a corresponding one of said receiving apertures." '023 Patent, Col. 10, ll. 45-47.

Claim 13 & 17: "a plurality of attachment projections extending from said outer edge and being integral therewith, each of said plurality of attachment projections being constructed and arranged for attachment to said hood and for being positioned over said exit opening." '023 Patent, Col. 10, ll. 63-67 and Col. 12, ll. 3-7.

Claim 14 & 18: "said plurality of attachment projections is a snap-in tab." '023 Patent, Col. 11, ll. 1-2 and Col. 12, ll. 8-9

Claim 15: "said plurality of attachment projections is a spring clip." '023 Patent, Col. 11, ll. 3-4.

Claim 16: "said plurality of attachment projections is a slide-on clip." '023 Patent, Col. 11, ll. 5-6.

The parties agree that a plain and ordinary meaning in the context of the patent is appropriate for "projections." However, in anticipation of parties disagreeing as to what constitutes the plain and ordinary meaning, Dundas Jafine proposes that "projections" be defined as: "objects that extend outwardly beyond a prevailing line or surface." Dundas Jafine's proposed construction adds extraneous limitations by adding "prevailing line" to the definition. The Court concludes that construction is not necessary and "projections" should be given its plain and ordinary meaning.

IT IS SO ORDERED.

DATE: April 16, 2014

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT